Number 228031 and number 228043. Council, you may proceed. May it please the Court, my name is Andrea Zaccardi. I'm representing Center for Biological Diversity in the Sierra Club today. My plan is to split our 20 minutes with Ms. Bax and Council for Western Watersheds Project and I will aim to reserve two minutes for rebuttal. I'd like to discuss two main issues today. First is Fish and Wildlife Service's reliance on conservation measures to support its conclusion that this project will not jeopardize grizzly bears. These conservation measures are vague, unenforceable, and not reasonably certain to occur, and other measures are ineffective so that even if they do occur, they are unlikely to protect grizzly bears. Part of your complaint on that issue as I read it was that, well this is just not going to work at all because you're relying on the permittees to enforce these measures. So how is this going to be enforced? How is it going to happen? Yeah, and the problem is that they're so in vague that the Forest Service cannot enforce them if the permittees do not comply with them. Well, if they don't comply, there's that heavy hammer called, you don't have a lease anymore. So they are in the terms and conditions of the permit, but you can't enforce mitigation measures that have vague language. So, and I would add that, you know, they don't, if they are not complied with, the lease doesn't automatically go away. The Forest Service actually has discretion to decide what to do. So in this list of conservation measures, there's what, nine of them? Are they all bad or just some of them? I would say most of them. The problem is that they relied on the conservation measures in totality as a whole. They didn't say we're relying on conservation measure one, you know, or nine and eight. Well, what if just a few of them are problematic? What happens then? They relied on them in totality. I'm asking you if just a few of them are vague, but the rest of them are fine, what should happen? Well, they still have to go back and reconsider whether, you know, if just two of them are okay. What if only one of them? What if only one of them is sort of, well, it'd be nice if it were a little more specific, but it's not. And does that mean that the Fish and Wildlife Service has been arbitrary and capricious in relying on them as a package? If they're not perfect, but one of them is a little bit vague, that has to go back? I would argue yes. Do you have an example where a court's ever done anything like that? Yeah, so I would point you to, I'm not going to try to pronounce this, ZZYYM v. Pompeo, which is out of the Tenth Circuit just a couple years ago. Well, now wait a minute. In that case, we said that three of the five reasons relied upon were invalid. That's a far cry from what I just asked you about. Well, I would argue there's actually four conservation measures here that are problematic as well. I would argue that either. I'm saying, is there a threshold that you need to show us before we should have to send this back? Because they relied on the conservation measures as a whole, I think that each of them needs to be reasonably certain to occur. So if one of them is a little off, then they've been arbitrary and capricious. That's your position? Yes. And you don't have another case? Because the one you just said goes far beyond that. Yeah, correct. You don't have a case? I don't have a case because this... All right. As long as we're on conservation measures, could you address the carcass removal conservation measure? I'd like to hear your position on why that one is problematic. Sure. The problem with that one is not that it's vague, but that it's ineffective to protect grizzly bears. So what they have to do is they have to remove carcasses if they're within a certain proximity of roads or trails, which is great to protect humans, but grizzly bears typically avoid roads and trails anyway. They have to remove them if possible. But if they can't do that, they can, instead of destroy them, they can just move them further into the allotments, which is more likely to draw grizzly bears into the project area. The other problem is if the carcasses are not near a road or a trail, they seemingly can just ignore them. There's nothing in the conservation measures that say carcasses in the project allotment, not near a road, need to be removed or destroyed. So are you saying that it really isn't a conservation measure? I'm sorry? Are you saying that the carcass removal numbers four and five really don't advance conservation? Right. I don't think they do much to protect grizzly bears. All right. Thank you. But don't they require more than just moving the carcasses away from the road? They have to remove them if possible. Totally get them out of there. Not just move them away from the road. Right. But if they decide removal is too difficult, not possible, they can just move them. And then they just have to move them away from the road instead of, you know, there's ways to destroy carcasses with lime or explosives. There's nothing like that required here. So they could move the carcass away from the road further into the project. Well, would they have to go down to the detail of what they do with the carcasses after they remove them? I mean, isn't it enough to say you must remove the carcass? Or do we have to say, and you need to put it in a pit and you need to use this many pounds of lime? Yeah, no, I don't think they have to say that. That's good. Yeah. As a couple of quick examples of the conservation measures that are vague and thus unenforceable and not reasonably certain to occur, I'd point you to conservation measure number three that says Fish and Wildlife Service has to monitor the allotments on a regular basis. Fish and Wildlife Service in the past has said on a regular basis is too vague. It needs to be more substantially defined. You know, we don't know what that means. It doesn't mean you have to check the allotments once a year, twice a year, once a month. I'm sorry, you said that the Fish and Wildlife Service has said that that's too vague? They have, and that's in the record and in our brief. In what context? It was a meeting with the Fish and Wildlife Service. Forest Service that year had checked the allotments only twice. And I think Fish and Wildlife Service didn't think that was sufficient. But because there were no parameters or sideboards on, you know, what on a regular basis means, there was nothing they could do to enforce that. Because I am running out of time, I'd like to talk really quickly about our female take claim. Even though Fish and Wildlife Service has recognized in the biological opinion that there are female grizzly bears, including reproducing female grizzly bears with young pups, establishing home ranges in the project area, more than ever before, there's not a single sentence in the biological opinion to show that Fish and Wildlife Service has actually considered implementing a female take limitation here. This means that numerous female bears could be killed, and there's no trigger to re-initiate consultation or do anything really to minimize female mortality going forward. Well, isn't the response to that generally that, well, this is not really a problem. We don't need to look within the project area. We can look the broader area that's under management. And we do have limits there, so it's going to be okay. Yeah, that is their argument, Your Honor. And the problem with that is the ecosystem-wide mortality limits are implemented in the recovery plan under Section 4 of the ESA. That does not obviate Fish and Wildlife Service from complying with Section 7 of the ESA. And under that argument, for all biological opinions across the entire Greater Yellowstone ecosystem, we wouldn't even need to quantify take in those biological opinions. So I think that's extremely problematic. You're saying if that argument holds, you'd never have to discuss take at all? Correct. Yeah, they wouldn't have to quantify take in any other biological opinion because they'd just be looking at this broad umbrella of mortality limits. I'd like to defer my time to Ms. Maxwell. Thank you. Good morning. May it please the Court. My name is Megan Baxan. I represent Western Watersheds Project Alliance for the Wild Rockies and Yellowstone-Diuentas Connection. I'd like to start today with our argument related to the female population sink in the project area and then transition somewhat quickly into NFMA. A mortality sink is an area in which mortality exceeds or nearly exceeds survival. And in the project area, there is a documented female mortality sink, meaning that female mortality exceeds or nearly exceeds female survival throughout most of the project area. And both Fish and Wildlife Service and the Forest Service have noted that survival of female grizzly bears is critical to the long-term survival of the species. But nonetheless, the accompanying BiOp in this case does not analyze this project's expected contribution to the female mortality sink. It failed to consider an important aspect of the problem. And this is where the Helena Hunters case becomes particularly persuasive. The Court in that case said that where the Forest Service has raised a concern that a certain aspect of a project has the potential to harm an ESA-protected species, the accompanying biological opinion must address that factor. Its failure to do so is a violation of the ESA and the APA. And that is exactly what happened here. The accompanying BiOp has the word sink in it once. There is no accompanying analysis, and there is certainly no accompanying female analysis. And thus, they have failed to consider an important aspect of the problem because they have already expected that the alternative selected here is going to contribute to that population sink. The government in its brief says that grazing does not cause sink habitat.  I can, Your Honor. The cause of the sink is kind of irrelevant. The sink exists. It is documented. There are sections of the FEIS that state that the selected alternative will contribute to the sink. So whether or not grazing is the cause of the sink, it is going to contribute to it. And there is no analysis of what that contribution is going to be, which is why they failed to analyze an important aspect of the problem. They cite to a study by Schwartz in their brief. Is that study relevant to this question? Do you know what I am referring to here? From what I recall, Your Honor, that study mostly discusses population sink dynamics and how they came to the understanding that there was a population sink. But I would not say that it is directly relevant to your question, no. If there had been limits placed on the number of female takes, grizzly takes, would that assist in resolving this issue? Do they go hand in hand, I guess is what I am asking? I think it is kind of an overarching way of looking at this, is that there are several issues with this biop that all sort of independently contribute to an exacerbation of loss of females, which, as I noted, is something that they have already said needs to be minimized in order to preserve the long-term viability of this population. So perhaps if there had been female-specific take limits, that would ameliorate the concern about the sink, but that is not what they did here. The environmental impact statement does refer to the impact of the project on the sink. Correct. In the project area, but it also concludes that the project wouldn't threaten continued recovery of species. So why doesn't that mitigate the argument that you are making? Well, because we are lacking any analysis of why that is true, and when we have no analysis, it is just an assumption. We needed the analysis to say why that was the... Well, are you saying that the biop doesn't have the analysis? Well, I think you are saying the biop doesn't have the analysis, but does the EIS not have the analysis? The EIS says that it is expected that alternative two and alternative three, that is the alternative that is selected here, kind of a hybrid of those two, are expected to contribute to the sink. But again, it goes on to say that the project isn't going to threaten continued recovery of the species. So I guess what I am asking you is, is that statement in the EIS enough to cure whatever defect you are alleging in the biop? I would say no, it is not, Your Honor, because again, there is no analysis of how that conclusion was arrived at. There is a documented sink. There is the expected contribution of this project to the sink, and there is a single line that says that it will not impact the recovery of the species, which is actually kind of a different question. So the sink itself still needed to be analyzed. The project's contribution specifically to the sink needed to be analyzed. And without doing that, it was a failure to look at an important aspect of the problem. Are the two statements inconsistent? Potentially. I have very little time, so I am going to try to do my elevator pitch for NIFMA. NIFMA requires that agencies, when they authorize a project, must ensure that that project is in compliance with the Governing Forest Plan, which here is the Bridger-Teton National Forest Plan. But as you will see from our briefing, the selected alternative does not comply with the Wildlife Cover Standard. It says so in the FEIS. And so by choosing an alternative that only complies with one objective, after having proven through Alternative 4 that they could actually comply with both, the AUM standard and the Wildlife Cover Standard is arbitrary and capricious. And I will leave the rest of my time for rebuttal. Thank you. May it please the Court, Rebecca Jaffe, appearing on behalf of the United States. I'm going to present for 15 minutes, and then interveners are going to take five. Starting with the Endangered Species Act claims, I think it's important to recognize the background here, which is that the grizzly bear is a major conservation success story. The population is growing. Its territory is expanding. It is biologically recovered. And this recovery has occurred while grazing has been happening on these allotments. Turning to the conservation measures first, as the Court noted, these are terms and conditions of the permits. They're enforceable, and permittees must comply to remain in good standing. The compliance issues that plaintiffs noted have all been with a sheep permittee. They're from over five to – they're about from 2012-2013. The sheep permittee is no longer on these allotments. There were challenges with that particular permittee, and sheep require some different management than cattle. But there's nothing in the records – – damaging to the habitat as far as grazing and grass. We can agree to that, can't we? They eat the grass right down to the root. They do. They also – they're smaller, and they wander more, and so grizzlies are more likely to go after them. Off the record. Yes. Anyway, the record shows that there's been excellent compliance from the cattle permittees, and the Forest Service is frequently monitoring. It's going out and assessing. I don't think it's vague at all. The Forest Service has to monitor, are the permittees and their riders watching livestock closely? And the Forest Service can go out and say, are they watching them or are they sitting in camp playing cards? And you need some flexibility because the terrain is so variable. What it looks like to watch them closely may be different depending on the terrain. But what – go ahead. Go ahead. Well, the use of the word regular. Monitor allotments on a regular basis. How about once a month, weather permitting, or something tangible instead of regular basis? I mean, I think, first of all, the Forest Service is out there at least once a week. But to that point – Out there. There's a lot of there there. Excuse me. Is out on the allotments – I believe so, yeah. I mean, it depends. There's other issues in these allotments. There's recreation and things like that. So I can't say that they're on every grazing location every week. But some weeks they said they're out there five days a week. But I think the bigger question here is – Are we off the record again? That is – how often they're on now is not in the record now. But I think the bigger question is, does the record show that the Fish and Wildlife Service was arbitrary and capricious in concluding that this will jeopardize the species? There's nothing in the record that shows that the Forest Service isn't monitoring the allotments regularly. And there isn't anything in the record that shows that the cattle permittees are not complying with the compliance measures. This is not a case where the Fish and Wildlife Service said there's no jeopardy because of a mitigation plan that they might develop in the future. The biological opinion specifies the conservation measures, and the fact that they are enforceable permit terms. I want to specifically address – I did say in the opinion it says they reached the no-jeopardy conclusion after reviewing, among other things, the conservation measures. Yes. So you're not suggesting this wasn't a significant factor or wasn't an important factor for them in reviewing? I am not. It was a factor that the Fish and Wildlife Service reviewed. I think what I'm contrasting is to – there were a number of cases that plaintiffs cited in their briefs where courts said, you know, you don't even have a mitigation plan yet. You don't have a way – you don't even know what it is, and you can't have a no-jeopardy conclusion if you don't know what the mitigation measures will be. That's not this case. No, but there's also cases suggesting that if your measures are not specific, if they're not enforceable, if they can't be – there's no way to assure they'll be implemented, that that's also not sufficient. So what about those cases? Because we do have numerous measures here. Riders are required to watch all livestock closely. What does that mean? How many riders? How often do they check? Well, the record indicates that – I'm asking what this measure says. If it's a measure, there's got to be some means of implementing it and enforcing it, essentially. Otherwise, what's it worth? So – And what about three? The Forest Service will monitor allotments on a regular basis. We've talked about that. How about the Forest Service will recommend – it's not even a mandatory – that all permittees and their reps carry bear spray? There's several of them that just – there's just no – they don't have any substance. So the Forest Service has to recommend that permittees carry bear spray, and the record indicates that they have done so in the past, and it doesn't – it's not enforcing, it's just recommending. Well – How is that meaningful? How is that enforceable that they do carry bear spray? Is somebody checking on that? I mean, I'm just – I'm saying these are all nice and aspirational, but you have to be able to show that they are going to be implemented. Otherwise, they're just meaningless. So, again, I would say these are terms and conditions of the permits. So if the Forest Service goes out and says, you're not monitoring your livestock closely, we see a permit violation. There's a process it can go through. Wouldn't the answer be, what does closely mean? Yes, we are, because we're doing whatever we're doing, and you didn't tell us what closely means. Well, I think the record would show with the sheep permittee, and that's not these permits. The Forest Service was saying, you're not monitoring closely. You're not keeping an eye on these sheep. You're not moving them when we tell you to. You're not doing – And so I do think the Forest Service does take its obligations very seriously. And there – I mean, I don't think you need specificity. Simply – I mean, to some extent, the question is, are these conservation measures a factor that the Fish and Wildlife Service considered? They are. Is there evidence – was there evidence before the Fish and Wildlife Service that people aren't complying with them? There's no purpose in saying you have to be out at the allotments every third day. Is there case law suggesting that that's what we should look at, is whether there's evidence in the record that there's no compliance with vague standards? Or do we look at the standards themselves and say, all right, how specific are they? Can they be implemented? Can they be enforced? Should we just look at the records? Should we just surround ourselves with a record and try to figure out whether any of these are a problem? Implementation of them is a problem? Is that our job? So I have a couple of responses to that, Your Honor. First, I would say this is an Administrative Procedure Act case. So the question is, what was in the record before the agency, and was the Fish and Wildlife Service's decision arbitrary and capricious based on that record? Plaintiffs relied on a lot of cases, many district court cases that were out of circuit, where courts said these conservation measures aren't good enough. And looking at those cases, there were a lot of situations where the court said, you don't even know what your mitigation plan is. You're saying that you're going to develop something in the future, and that's not the situation that we have here. You know, I'm a little confused on the situation we have here. When you say the record shows that there was compliance, does that mean that the conservation measures that we're reviewing right now have gone into effect and we have experience under these specific conservation measures? Is that what you're saying the record shows? Because these conservation measures have been in prior permits, and so monitoring reports under prior permits are in the record. Okay, that's what I thought you were saying. I apologize for being unclear. So we have some experience under comparable conservation measures, but not these conservation measures. I believe that they've been identical in prior permits. You're saying in the project area that we're talking about right now, have these conservation measures gone into effect, and do we have a track record of compliance with them in the record? Yes. Yes, because the prior permits had these conservation measures. No, that's not what I'm asking. In this project area. I'm talking about these conservation measures. Compliance with other conservation measures that might be comparable or the same may go to the question of whether these will be effective. I'm not sure they necessarily clear up the lack of specificity, but I think I understand your answer, and I don't want to take too much more of your time. Could you address the carcass removal? Certainly, Your Honor. So the carcass removal requirement basically says, if you have a carcass that's close to certain areas where we know humans are likely to be, campgrounds, roads, springs, you need to move it away from there. You need to remove it first if possible, and if you can't remove it altogether, you need to move it. And the reason for that is to protect humans, but also to protect the bears. You don't want grizzlies to become habituated to humans and environments where humans are. The agencies also want to avoid human-grizzly conflicts. Aside from the potential risk to the human, if there's a human-grizzly conflict, that's almost certainly going to result in the removal of the bear. It says, if possible, because sometimes the terrain or it's not safe for the permittee to move the carcass, and they have to ask for an exception. And that might be, if there's a grizzly bear nearby, the grizzly bears will defend their carcasses and attack someone that comes near, so you obviously don't want to require a permittee to do something that could lead to that. Or if you have a carcass that's on maybe a really steep 40-degree slope and it weighs a couple hundred pounds, you could potentially have an injury if you try to move that carcass. So that's why there's the exceptions. I understand. If I'm understanding Western Watershed's argument, though, it's that if carcasses need to be moved, for example, from roadside or close to roadside locations and then moved further off-road, that that's going to attract more grizzlies, and that's going to put bears at risk. And so in that sense, the conservation measure is counterproductive. It's not a matter of vague or ineffective. It cuts the other way. If I'm understanding their argument now, is that how you're understanding their argument? And either way, do you have a response to that? Yes, Your Honor. First of all, the biological opinion notes studies that show that even bears that have eaten carcasses don't become more depredatory and start eating live cattle. That's at 2-AP-174. So there isn't any indication that if a bear eats a carcass, it's more likely to start eating cattle that are alive. I'm reading from 2-AP-160 from the biop. Grizzly bears preferentially use large areas with a low density of roads and low levels of human activity. So if you're moving carcasses to those areas, that's where the grizzly bears prefer to go. They may. Well, that's what the biop just said. But the question is, does this further endanger the grizzly bear? And a conflict doesn't occur when a grizzly bear eats a carcass. A conflict occurs when a grizzly bear eats a live cattle, when there's a conflict with a human. And that's what a conflict is. And I do want to flag that the first thing is remove the carcass altogether if possible. So at 2-AP-174, it says there's nothing that indicates that grizzly bears that eat carcasses become more likely to attack cattle. And that's what can cause conflicts that can eventually lead to the removal of a bear. Could you discuss the limitation or not limitation on female grizzly bears? Yes, Your Honor. It was not arbitrary for the Fish and Wildlife Service to not have a female take limit for three reasons. The first is the demographic parameters, which have an annual mortality limit for females, males, and young, and consider all causes of mortality. The plaintiffs suggest in their reply that the demographic parameters don't really require any action. But if the population drops below 600, no discretionary mortality is permitted. Even if there's still take that could be remaining on this incidental take statement. And this explanation isn't post hoc. It's all in the record. For example, the 2019 Biological Opinion at 2-AP-192 says the anticipated level of grizzly bear mortality caused by the proposed action falls within the scope of the demographic recovery criterion to maintain the population by maintaining annual mortality limits. But I don't understand why when it had been emphasized repeatedly in prior plans, 217 Supplemental Recovery Plan, there was a big deal made about female grizzly bears and needing limitation on their take. And then when we get down to the biop, it's gone. So we're talking generally about this ecosystem, which is a whole much more broad area. But the demographic parameters ensure that you won't have excessive mortality of females. I think it's also important to remember that there's a whole process that goes forward before any bears are removed. There's coordination between the Fish and Wildlife Service, the Wyoming Fish and Game Department, the Fish and Wildlife Service, Grizzly Bear Recovery Coordinator needs to sign off. And they consider, among other things, the sex of the bear. So you don't have to have a limitation included in the biop because you have this limitation in the larger area. That's your answer. And because there's so much consideration that goes into before any removal occurs, and the consideration includes whether the bears are female. In addition, this isn't boilerplate past practice. There's been no female take limit in two previous biological opinions. There's been a take limit or an explanation of no take limit in more of the opinions than there's been nothing. Right? I mean, you've got, well, it's not important, but you've got, there's only like five of them. At least three of them there's been a discussion of why there isn't anything, which was 2010. And in two of them, 1999 and 2013, there was an actual limit. And here we have an identification of this being a very serious issue. And there's no discussion. None. So the court, the Supreme Court has said that the court will uphold a decision of less than ideal clarity. Well, what do you mean less than ideal clarity? There's nothing. There's nothing. We don't have anything. We have the statements in the biological opinion about the demographic parameters. We have the statements. Something for the entire area. But I think the reply briefs, one of the reply briefs makes, I think, a pretty strong point that there's a whole different, the reason you want to have the limitations within the project itself is because there's a whole system of monitoring and enforcement that goes into that at that smaller level, you know, within those parameters. And we've got nothing here. There will be no monitoring because you don't have any limit on that. And you may have it on a system-wide basis, but that's not monitoring this particular project. I mean, there's an effect here when you don't have those limits in place. And it's different. It's different than when you have an entire system. I beg to differ, Your Honor, because the Fish and Wildlife Service is involved in every removal decision that occurs on this allotment. It gets annual reports. But their requirements are different. When you've got a mortality limit like this, female mortality limit within a particular project, their monitoring requirements are different and more specific for this particular project. Wouldn't that be true? It would have some meaning is what I'm saying. Well, the reporting language, the annual monitoring reports that the Forest Service has to submit, has the same language that it's had in past permits. How many takes have occurred? What was the sex of the bear? So, you know, I think the Fish and Wildlife Service is still acutely aware of what's happening on these allotments and what's happening in the broader ecosystem. Why isn't the broader ecosystem issue, why isn't that, you could have specified in the opinion itself that you were relying on the broader ecosystem female take limits, right? And you didn't specify that. I think that the Fish and Wildlife Service did say that the anticipated level of grizzly bear mortality falls within the scope of the demographic recovery criteria for females. Female take limits now. I mean, so I think what might be missing is, and therefore we do not need a female take limit. So you have five words that you don't have, but you had those words in 2014. The discussion in the BIOPS discusses the demographic parameters. It discusses the protocol before any removals occur. It discusses that the population is stable, is increasing. I know she wants to have more time, but I wanted to ask a question about the plan and the grazing authorizations. The Forest Service, that's the first issue I think that was raised about the, essentially that the objective 4.7D was overlooked in this case. And I guess I think what your response was, was that you had to do this balancing act between 1.1, whatever it was, and 4.7D, the two different objectives. But I struggle to see why you need to do that balancing act when there's no conflict, because according to your own evidence, there was an alternative, alternative 4, that would have met both of those objectives. And you chose alternative 3, which you knew would mean you couldn't retain suitable cover for the sensitive amphibians and migratory birds. That was going to be the result. So why not, where's the conflict if you can choose alternative 4, which would meet both needs? And is there, can you even look at balancing, can you balance the various interests if you could satisfy them both with one alternative? Sorry about the long question there. No problem. I have a couple of responses, Your Honor. First is, we do believe that the alternative that the Forest Service selected ensures that there will be suitable and adequate cover and forage for wildlife. And you can see that in the host of protective measures that the Forest Service implemented. The forage utilization is stricter than it's been in the past, and stricter than the Forest Plan even allows. The Forest Plan allows 65% utilization. This alternative that the Forest Service selected mandates 50% utilization, except for one allotment that is irrigated. I thought the Forest Service itself said that it wouldn't, that alternative 3, which it selected, would not retain suitable and adequate cover for sensitive amphibians and migratory birds. I'm not sure how you get past that. So, I'm not sure what the court is referring to, but in the... I misunderstood that. It's in the wildlife specialist report. It's in the report, right. In the record of decision, the Forest Service says that we're going to satisfy the objectives for cover. But how do they do that when they know that it doesn't? So, the wildlife specialist report was referring to the herbaceous retention indicator. That is not... And that's one of a host of indicators that the Forest Service used to evaluate conditions on the allotments. It also looked at ground cover, depending on vegetation type, species composition, invasive species, canopy cover for sage grouse. That line that I just repeated, do you think that came from just the herbaceous retention indicator concern? I don't have it in front of me. It may be... It seemed pretty broad. I believe that it was referring to herbaceous retention. The herbaceous retention indicator of 70% is not anywhere in the forest plan. The forest plan says, require suitable and adequate amounts of forage, and then the standard that Western Watersheds Project cites says that, basically, there will prescribe site-specific utilization levels needed to meet forest plan objectives. So, you circle back to suitable and adequate. I want to emphasize a couple points on this point, and then I'm going to sit down because I'm way over time. I apologize. The first is that the final environmental impact statement says, at 11-AP-169, that these indicators, including the herbaceous retention indicator, are not meant to be a design feature or a required end result. They're used to compare and contrast. And the second point I want to make is that Alternatives 3 and 4 were not identical in terms of their impact on permittees, and the record of decision explains at 4-AP-137 that it would have been stricter on permittees. Alternative 4 basically had a much stricter forage utilization requirement of 35% everywhere. And what that means is that if you have, say, less growth one season because of drought, then permittees have to either graze fewer cattle or get their cattle off the range more quickly. Move them around more? Well, I mean, if everywhere has 35% of a max, and you'll have to move from each pasture earlier, and then eventually you'll just have to get off the range because you've done your rotation. Counsel, the site that you just mentioned, the EIS, on your first point in response to Judge Moritz, that the indicators are not meant to be design features, do you have a handy site to that in the EIS? Yes, Your Honor, that's at 11-AP-169. It says indicators are used to... Okay, that's fine. I just want to make sure I... I'll find it a lot more quickly now that I have the site. We ought to give your colleague... I apologize. Thank you. Would you like to take two minutes? Whatever you give me, Your Honor. I think that's about it because we're way over. And then we'll even it up. May it please the Court, I'm Joseph Bingham. I represent the ranchers whose families have grazed their cattle in the project area uninterrupted for the last hundred-some years. They don't have a right, right? It's a privilege. It is a privilege, but they've been faithful stewards. And what I want to emphasize is in the unlikely event that this Court concludes that the district court's excellent analysis was flawed, the vacatur is not the appropriate remedy. The decision and the hundred-year status quo should remain in place. The consequences of even a single lost season of grazing would threaten to destroy all of my clients' businesses, forcing, the record says, a 50% to 66% reduction in their herds and many of them to go out of business. Vacatur is equitable relief, and it falls within the equitable discretion of this Court. And here, where the agencies are likely to be able to remedy their decision on remand and are unlikely to, for the first time in a hundred years, bar grazing in the project area, it would be unreasonable to destroy all of my clients' businesses while those deficiencies were remedied. Isn't this all a fact question for the district court to decide if we were to remand it under our recent opinion? This Court did hold last month that the Allied Signal Inquiry normally belongs to the district court. Here, we think the record is so clear and so one-sided that it would be justified to remand with instructions not to vacate the decisions while they were remedied. Thank you. Thank you, counsel. I know you had some rebuttal time, and we probably, in fairness, owe you a little more, so go ahead. Thank you. I'd like to address a couple of points here. The first is about the conservation measures. I'd like to point out there is nothing in the record to show that the Forest Service has complied with the conservation measures here, including regularly monitoring the allotments. The bigger problem, obviously, being that there are no sideboards as to what regular means. And the Ninth Circuit recently explained why conservation measures are problematic when they're too vague. This was in Center for Biological Diversity v. Bernhardt, which is cited in our brief. And the court there said an indefinite mitigation measure is less likely to trigger reconsultation because it will be difficult to know at which point or whether the action agency has failed to comply. For this reason, measures that are too vague are generally unenforceable under the Endangered Species Act and thus cannot be properly relied upon. I think that is the exact problem we face here with several of these conservation measures. I want to quickly address the carcass issue. Even if grizzly bears don't necessarily... Well, there's nothing in the record to show that they feed on a carcass and go back to the project area. With the situation we have here, we potentially have carcasses spread throughout the landscape in this project area on public lands. The record does show that grizzly bears are drawn to carcasses from more than seven miles away. I think moving carcasses further into the allotment or completely ignoring carcasses in the project area that are not near roads is extremely problematic. I just want to quickly address vacatur because the state just brought that up. I would say that it's not that clear-cut under the facts. The laws of the Endangered Species Act are supposed to be given priority over the primary mission of federal agencies. Typically, the balance should be struck in favor of protecting an endangered species. And because the parties have not had a chance... How is that inconsistent with... Why wouldn't an A be the guide? If we agree with one or more of your arguments, why wouldn't the next step be a remand to the district court for the allied signal analysis? That's what I was actually just going to say, Your Honor. We would propose that if the court finds in favor for repellents here, that you would remand that case so the parties can fully brief that issue. You also asked, though, for a preliminary injunction if we did remand. Yeah, in the meantime, to protect grizzly bears. It could be a year before the district court makes a decision on that and grizzly bears are continually being killed. Would that shut down grazing, as the appellee suggested? I mean, what would be the effect of a preliminary injunction? Yeah, shut down grazing or at least stop killing grizzly bears in the meantime. I'll defer my time to Ms. Baxton. I'm going to address some of the NIFMA points, but first I want to go back to a little bit of context and point out that this project area is home to one of only three known boreal toad breeding areas in the entire 3.4 map. That's a million acre national forest, which is why this cover objective is particularly relevant here. And then I wanted to point to 12 Appendix page 254, which is the FBIS, where we have a host of statements about how the chosen alternative here will negatively impact amphibians, including it would reduce herbaceous cover and amphibian habitat levels below desired conditions. Desired conditions would typically not be met, cover and cover benefits would not be met. That's an important page for seeing what this project is going to do to amphibian habitat. As far as the idea of balance, I want to point this court to 13 Appendix 042 and the direct quote from there in analyzing Alternative 4 is, quote, designed to balance the livestock grazing with the habitat needs for a variety of wildlife species as directed by the Bridger-Teton National Forest Plan. And I would just say again, Alternative 4 did strike that balance. And then arbitrary and capriciously, the Forest Service selected an alternative that only meets Objective 1.1H. Thank you for your time. Thank you, counsel. I'd like to thank all of the counsels who argued this morning. We appreciate your help on this case. It will now be submitted and counsel are excused. The court will now stand in recess. Thank you.